IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


TOMMY E. GATTIS             .                                           PLAINTIFF


              V.                  Civil No. 3:14-cv-03037-MEF


CAROLYN W. COLVIN, Commissioner,
Social Security Administration                                          DEFENDANT


**MEMORANDUM OPINION**

Plaintiff, Tommy Gattis, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.      Procedural Background:**

Plaintiff filed his applications for DIB and SSI on October 18, 2011, alleging an onset date of November 22, 2010, due to depression, cardiovascular disease, three bulging disks in his neck, a bulging disk in his back, a metal plate and screws in his left wrist, depression, anxiety, and a learning disability. Tr. 223-235, 256, 260, 278-279, 309-310. The Commissioner denied his application initially and on reconsideration. Tr. 12. At the Plaintiff's request, an Administrative

Law Judge ("ALJ") held an administrative hearing on October 17, 2012.  Tr. 21-59.  Plaintiff was present and represented by counsel.

At the time of the hearing, Plaintiff was 44 years old and possessed a tenth grade education. Tr. 40, 106, 256, 261.  He had past relevant work ("PRW") experience as a tow-truck driver, welder, automobile service station attendant, and construction worker.  Tr. 107-115, 152, 261, 268-275.

On May 10, 2013, the ALJ concluded that the Plaintiff's mild osteoarthritis/degenerative joint disease ("DJD") of the cervical and lumbar spine, degenerative disk disease ("DDD") and dextroscoliosis of the thoracic spine, DJD of the left upper extremity status post open reduction and internal fixation, coronary artery disease ("CAD") status post myocardial infarction and stenting, history of bronchitis, borderline intellectual functioning ("BIF"), math disorder, and adjustment disorder with depression were severe, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  Tr. 32-35.  After partially discrediting Plaintiff's subjective complaints, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work,

> "except he can never climb ladders, ropes, or scaffolds and can only occasionally balance, stoop, kneel, crouch and crawl.  He cannot perform work overhead or reach overhead and can perform frequent, but not constant, handling with his left, non-dominant upper extremity.  He must avoid concentrated exposure to temperature extremes, humidity, fumes, odors, dusts, gases and poor ventilation as well as hazards, including no driving as a part of work.  Nonexertionally, the claimant can perform work where interpersonal contact is incidental to the work performed, the complexity of tasks is learned and performed by rote, using few variables and little judgment, and the supervision required is simple, direct and concrete."  Tr. 35.

The ALJ then found Plaintiff could perform work as an assembler (light and sedentary), machine tender, and inspector (light and sedentary).  Tr. 41.

The Appeals Council denied the Plaintiff's request for review on March 20, 2014. Tr. 1-4. Subsequently, Plaintiff filed this action. ECF No. 1. This matter is before the undersigned by consent of the parties. ECF No. 7. Both parties have filed appeal briefs, and the case is now ready for decision. ECF Nos. 10, 11.

## II.     **Applicable Law**:

This court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v.* Astrue, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id.*

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and

3

laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(c). A Plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.   Discussion:

Plaintiff raises a single issue on appeal: whether the ALJ's RFC determination is supported by substantial evidence. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009)*; see also Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (ALJ is responsible for determining RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of his limitations). Limitations resulting from symptoms such as pain are also factored into the

4

assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003); *see also Jones*, 619 F.3d at 971 (RFC finding must be supported by some medical evidence).

For simplicity, we will address the evidence concerning the Plaintiff's impairments as follows:

    **A.**    **Cardiac and Respiratory Issues:**

Records document a history of cardiac issues including a stenting procedure in 2007, an episode of unstable angina in 2008, and a nontransmural myocardial infarction resulting in additional stenting in 2011. Tr. 359-386, 499-504. On June 7, 2011, Plaintiff was transported to the hospital by ambulance, due to chest pain, shortness of breath, and nausea. Tr. 359-386, 404-412, 417-426, 583-591. He reported taking three Nitroglycerine without relief. Upon admission, his cardiac markers were negative, but trending upwards. As such, he was admitted. Dr. Erick Araneda performed a left hearth catheterization, selective coronary angiography, left ventriculography, aortic root aortography, and stenting of the right coronary artery. Post stenting images revealed severe right CAD, a patent right coronary artery stent, moderate left anterior descending and circumflex disease, severe small vessel disease of the obtuse marginal #1, near normal left ventricular function of 50%, and successful stenting of the right coronary artery times three. Plaintiff was discharged with diagnoses of a nontransmural myocardial infarction status post stent times three to the right coronary artery, hypertension, dyslipidemia, and tobacco dependence. Dr. Araneda prescribed Lisinopril and Pravastatin.

On June 17, 2011, Plaintiff established care with Dr. Anandaraj Subramanium. Tr. 392-394. Noting Plaintiff's history of CAD of the native coronary artery, he indicated his "course of disease has been stable." He advised the Plaintiff to monitor his symptoms, take Aspirin daily for cardiac protection, lose weight, reduce his sodium intake, exercise, take a Potassium supplement, monitor his blood pressure, modify his diet to lower his cholesterol, and reduce stress. Dr. Subramanium also prescribed Lisinopril, Nitrostat, Pravastatin, and Plavix.

On July 6, 2011, Plaintiff presented at the Mountain Home Christian Clinic ("MHCC") for medication refills. Tr. 399. The doctor assessed heart disease with advanced CAD. He prescribed Aspirin, Plavix, Lisinopril, and Pravastatin. The record also reveals that the Plaintiff continued to smoke one package of cigarettes per day.

On September 8, 2011, Plaintiff followed-up with cardiologist, Dr. Araneda. Tr. 401-403, 414-416, 579-582. He primarily complained of intermittent sharp and shooting chest pains, shortness of breath with exertion, and arthralgias. Dr. Araneda diagnosed CAD status post stent surgeries in 2007 and 2011, noncardiac sharp and shooting chest pains, SOB, hypertension, and dyslipidemia. He prescribed Aspirin, Lisinopril, Plavix, and Pravastatin. He counseled Plaintiff with regard to smoking cessation, and advised him that he would be on Statin and Plavix indefinitely.

On November 10, 2011, Plaintiff presented in the emergency room ("ER") with complaints of chest pain over his left anterior lower lateral chest for two days. Tr. 445, 568-577. He described it as continuous and indicated that deep inspiration exacerbated the pain. However, Plaintiff admitted that this pain was unlike any he had experienced in the past. A chest x-ray and EKG were both unremarkable. Accordingly, the ER doctor diagnosed chest wall pain and prescribed anti-inflammatories and Norco.

On December 16, 2011, Plaintiff returned to the ER due to shortness of breath and sharp pain over the left lateral part of his chest. Tr. 440-451, 557-567. Again, he reported the pain was made worse by deep inspiration. Although his oxygen saturation was at 99% on room air, he was administered breathing treatments. The doctor diagnosed bronchitis and pleuritic chest pain, and prescribed antibiotics and a short course of oral steroids.

On January 13, 2012, Plaintiff's shortness of breath continued. Tr. 482. He reported some improvement with Albuterol, but was out of medication. The doctor diagnosed resolving bronchitis, and prescribed Ventolin updraft treatments.

On January 11, 2014, a chest x-ray was normal showing no evidence of heart failure. Tr. 10-11.

After reviewing the medical record, the undersigned can find no error in the ALJ's RFC determination. While the evidence does reveal some occasional non-cardiac chest pain, Plaintiff has not sought out treatment for cardiac related chest pain since 2011. Further, since his last stenting procedure in June 2011, Plaintiff's discomfort has been treated conservatively via medication. *Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's conservative treatment was inconsistent with Plaintiff's allegations of disabling pain). Chest x-rays and EKG's have revealed no evidence of heart failure. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider). And, no additional heart catheterizations have been warranted.

The record also reveals that the Plaintiff's bronchitis has been episodic, at best, and responsive to medication. *Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling). In fact, he was treated for lung related issues on only two occasions during the relevant time period.

We also note his failure to follow his doctor's recommendation with regard to smoking cessation. *See Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (a failure to follow a recommended course of treatment weighs against credibility).

Therefore, we find substantial evidence to support the ALJ's determination that the Plaintiff's ability to perform light work is eroded by his heart and lung impairments rendering him incapable of working near hazards, performing jobs requiring him to drive, and performing work involving exposure to fumes, dusts, odors, gases, and poor ventilation.

### B.     Back, Neck, and Left Arm Pain:

Plaintiff has also alleged disability due to DJD of the cervical and lumbar spine, DDD and dextroscoliosis of the thoracic spine, and DJD of the left upper extremity. The pertinent evidence reveals as follows:  In September 2008, Plaintiff was treated for back and neck pain. Tr. 506-513, 517-520, 524-526, 531-533. He had a limited range of motion in his neck with localized tenderness over the cervical facet joint. His gait and posture were guarded, and extension and side-to-side bending reproduced pain. Dr. Meraj Siddiqui assessed cervical spondylosis, cervical disk displacement disorder, lumbosacral spondylosis, and chronic pain syndrome. He prescribed Hydrocodone and recommended bilateral branch blocks at the C3-6 and L3-S1 levels. On September 23, 2008; November 3, 2008; and, November 18, 2008, Plaintiff received the recommended blocks. Tr. 514-515, 522-523, 528-530. The branch blocks appear to have been successful.

On February 17, 2010, Plaintiff presented in the ER with mechanical lower back pain he described as a "clinching" sensation. Tr. 347-350. A physical examination revealed a limited range of motion in the right lower extremity with paraspinal tenderness to palpation. X-rays of his

lumbar and thoracic spine showed scoliosis and diffuse bony demineralization. The doctor administered Percocet and prescribed anti-inflammatories.

In March 2011, Plaintiff complained of long-term neck pain. Tr. 387-390. He reported injuring his neck when he was 12 years old, stating he had been told he had "blown out disks." However, he denied currently taking any medications, in spite of his heart condition. Although he did have tenderness along the spine and paraspinous muscles on the right side, no numbness, weakness, tingling, or radiation was reported. The doctor diagnosed chronic neck pain, administered a Toradol injection, and prescribed Diclofenac.

On June 17, 2011, Dr. Subramanium treated Plaintiff for complaints of neck pain. Tr. 392-394. He reported posterior discomfort with no radiation. An examination revealed pain with range of motion on neck extension, lateral extension, and rotation. Dr. Subramanium diagnosed neck pain and prescribed range of motion exercises, cold packs, moist heat, and massage. He also recommended chronic pain management.

On July 6, 2011, the doctor at MHCC noted Plaintiff's history of neck pain. Tr. 399. He prescribed Tramadol.

On July 11, 2012, Plaintiff was treated for increasing pain in his left elbow. Tr. 546-555. An examination revealed slight discoloration, tenderness to palpation, slight swelling, and a tingling sensation. X-rays revealed a thickened capsule, resulting in a diagnosis of capsulitis. The doctor prescribed Hydrocodone and Prednisone.

On September 20, 2012, Plaintiff again complained of severe neck pain. Tr. 536-545. An examination revealed severe stiffness with attempted range of motion in the neck. The doctor administered a Toradol injection and prescribed Flexeril to treat his severe neck pain, cervical radiculopathy, and DJD.

On January 17, 2013, Dr. Joseph Ricciardi performed a general physical examination on behalf of the Commissioner. Tr. 598-607. The examination revealed generalized posterior tenderness and a limited range of motion in the neck, a limited range of motion in the left wrist with dorsal tenderness, tenderness to palpation in the thoracic spine with a limited range of motion, and tenderness to percussion in the lower half of the lumbar spine and the posterior midline. X-rays showed degenerative changes of the carpal bone with osteopenia and post-surgical changes of the distal radius, dextroscoliosis with degenerative spondylosis in the cervical spine, and mild degenerative changes in the lumbar spine. Dr. Ricciardi diagnosed Plaintiff with DDD of the cervical, thoracic, and lumbar spine, scoliosis, DJD of the left wrist status post trauma and surgery with retained hardware, and posttraumatic organic brain syndrome. He assessed the Plaintiff with a 24% impairment rating, and opined that he would "not be returnable to gainful employment."

On August 23, 2013, Plaintiff presented in the ER for treatment of pain in his right groin, which he indicated had been present since his stent placement in 2011. Tr. 14-21. He had reportedly been out of his pain and cholesterol medication for two weeks. MHCC did not have clinic hours the previous week, and he indicated it would be another week before he could see a doctor. An examination revealed tenderness over the insertion of the muscles over the inguinal crease. The doctor diagnosed chronic groin pain and hypertension. He gave Plaintiff enough Plavix and Lisinopril to get him through until his next appointment with his doctor.

The record also contains the assessment of a non-examining, consultant, Dr. Lucy Sauer, who completed an RFC assessment in December 2011. Tr. 431-438. Dr. Sauer concluded that the Plaintiff could perform a full range of light work. Dr. Bill Payne affirmed this assessment in March 2012. Tr. 484-486.

Due to pain, the ALJ further limited the Plaintiff's ability to perform light work with regard to climbing, balancing, stooping, kneeling, crouching, crawling, performing work overhead or reaching overhead, and handling with his left non-dominant upper extremity. We find these limitations to be supported by the overall record.

Plaintiff did not seek out consistent treatment regarding his left upper extremity, suggesting that the impairment was not as severe as claimed. *See Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (failure of claimant to maintain a consistent treatment pattern for alleged mental impairments is inconsistent with the disabling nature of such impairments). Further, while he did seek out consistent treatment for his back and neck pain, the medical evidence reveals no limitations imposed by the Plaintiff's physicians, reveals at least some responsiveness to conservative treatment, and contains no indication that surgery or more invasive treatment should be pursued. *See Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (none of the claimant's treating physicians opined the claimant was so impaired or disabled that the claimant could not work at any job); *see also Smith*, 987 F.2d at 1374 (holding that treating physician's conservative treatment was inconsistent with Plaintiff's allegations of disabling pain).

Plaintiff's reported activities also undermine his claim of additional limitations. More specifically, his ability to care for his personal hygiene without assistance, fish from the shore once per month, interact with his family, drive short and familiar routes, and shop in the store suggest he is capable of at least light level work. Tr. 36, 127-128, 136, 282, 284, 295-296, 316. *See Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004) (holding claimant's daily activities supported the ALJ's RFC finding).

Plaintiff contends that the ALJ's failure to assign great weight to Dr. Ricciardi's evaluation is error. Although a treating physician's opinion is often given controlling weight, "such deference

11

is not appropriate when the opinion is inconsistent with the other substantial evidence." *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)). The record as a whole in this case simply does not support Dr. Ricciardi's conclusion that the Plaintiff could not return to work in any capacity. It is also significant to note that the ALJ is not required to give Dr. Ricciardi's conclusion controlling weight because it invades the province of the Commissioner who is tasked with ultimately deciding whether a person is disabled. *See id.* at 1065 (physician's opinion of "totally disabled" receives no deference because it invades the province of the Commissioner).

The Plaintiff also asserts that the ALJ's reliance on a state agency medical consultant was error. However, these consultants are highly qualified physicians and are considered experts in social security disability evaluation. *See* 20 C.F.R. §§ 404.1527e (2), 416.927e (2). As such, in cases such as this, their assessments can provide support for the ALJ's decision. *See Stormo*, 377 F.3d at 807-808 (holding opinions of state agency medical consultants supported ALJ's RFC finding). Accordingly, we find no error in the ALJ's reference to these assessments as support for his RFC determination.

### C. **Mental Impairments:**

Plaintiff also suffered from depression, anxiety, and BIF. On July 6, 2011, he visited MHCC for medication refills. Tr. 399. The doctor noted that he appeared sad. Accordingly, he prescribed Celexa. He returned on September 8, 2011, with continued complaints of depression, anxiety, and difficulty sleeping. Tr. 401-403. Again, he was prescribed Celexa.

On January 3, 2012, Dr. Nancy Bunting conducted an intellectual assessment and adaptive functioning examination of the Plaintiff. Tr. 453-457. Plaintiff indicated that he had been taking Celexa and that it helped "some." The doctor noted his affect to be appropriate; his mood calm; and his thoughts logical, relevant, and goal-directed. Dr. Bunting administered the WAIS-IV on

12

which the Plaintiff earned a full scale IQ of 71, placing him in the borderline range of intellectual functioning ("BIF").  Accordingly, she diagnosed the Plaintiff with adjustment disorder with anxiety, depression, and a mathematics disorder.  Further, the doctor assessed him with a global assessment of functioning ("GAF") score of 52-62.  She found both his persistence and level of effort to be only fair.  Moreover, Dr. Bunting concluded the Plaintiff had "some" capacity to cope with the typical mental demands of basic work-like tasks, could handle "some" work stress and change, and had "some" ability to attend and sustain concentration and complete work-like tasks in an acceptable timeframe as long as his pain and fatigue did not interfere.

On September 6, 2012, Plaintiff again requested an increase in his dosage of Celexa.  Tr. 493.  He also reported some increased stress.  And, on February 16, 2012, Plaintiff records reveal that the Plaintiff was very depressed and experiencing sleep disturbance.  His Celexa dosage was again increased.

In addition to the treatment records noted above, the record also contains a mental RFC assessment from a non-examining consultative psychologist.  In January 2012, Dr. Jay Rankin concluded that the Plaintiff would be able to perform work where the interpersonal contact is incidental to the work performed, the complexity of tasks is learned and performed by rote with few variables and little judgment, and the supervision required is simple, direct, and concrete.  Tr. 458-475.

After reviewing the evidence documenting the Plaintiff's treatment for his mental impairments, the undersigned finds that the RFC determination is supported by substantial evidence.  The ALJ found the Plaintiff capable of performing work where the interpersonal contact is incidental to the work performed, the complexity of the tasks is learned and performed by rote with few variables and little judgment, and the supervision required is simple, direct, and concrete.

Although the Plaintiff contends this does not consider his BIF, we disagree. The United States Court of Appeals for the Eighth Circuit has held that that describing a claimant as capable of doing only simple work adequately accounts for borderline intellectual functioning. *Howard v. Massanari,* 255 F.3d 577, 582 (8th Cir. 2001).

We also note that the Plaintiff failed to seek out treatment for or voice complaints or limitations associated with his BIF. *See Forte*, 377 F.3d at 895 (holding that lack of objective medical evidence is a factor an ALJ may consider). Likewise, we can find no notations in the medical record to suggest that the Plaintiff's BIF restricted the Plaintiff further. Perhaps the most damaging, however, is the fact that he was able to perform both skilled and semi-skilled work, in spite of his BIF, prior to his alleged date of onset. Tr. 152. *See Roberts v. Apfel*, 222 F.3d 466, 468-469 (8th Cir. 2000) (noting claimant's ability to hold employment for many years with the cognitive abilities he currently possesses).

As for his depression and anxiety, while he did obtain some treatment through his primary physician, we can find no evidence to indicate that he ever sought out formal mental health treatment. And, there is certainly no evidence of inpatient hospitalizations or outpatient counseling. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (lack of formal treatment by a psychiatrist, psychologist, or other mental health professional is a significant consideration when evaluating Plaintiff's allegations of disability due to a mental Impairment). Accordingly, the ALJ's RFC assessment will stand.

**IV.     Conclusion**:

Having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the Plaintiff benefits, and the decision is affirmed. The

undersigned further orders that the Plaintiff's Complaint be dismissed with prejudice.

DATED this 18th day of June, 2015.

/s/ *Mark E. Ford*
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE